## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| HAROLD C. LAMPE, JR., | : | |
| Debtor. | : | **Case No. 08-18025 (JKF)** |
| _____ | | |
| JESTYN G. PAYNE, CUSTODIAN FOR LAUREN LAMPE, | : | |
| Plaintiff, | : | |
| v. | : | |
| HAROLD C. LAMPE, JR., | : | |
| Defendant. | : | **Adversary No. 09-0012** |
| _____ | | |

## <u>MEMORANDUM OPINION</u>

**BY:   JEAN K. FITZSIMON**
**United States Bankruptcy Judge**

The matter before the Court is twofold: (i) an adversary proceeding; and

(ii) an objection to claim ("Objection"). The adversary proceeding was filed by

plaintiff, Jestyn G. Payne ("Payne"), in his capacity as custodian for Lauren

Lampe ("Lauren"),[1] against Lauren's grandfather who is the Debtor, Harold C.

---

[1] The state court appointed Payne as Custodian for Lauren pursuant to a Stipulation and Order, dated August 6, 2008.  See *Exhibit A to Amended Complaint to Determine Dischargeability of Debt and Amount of Claim, Adversary Proceeding 09-12 ("Adversary Proceeding"), Docket Entry No. 13.*  The appointment is for the limited purposes set forth in the Stipulation and Order.

Lampe ("Debtor").  The Objection is the Debtor's objection to the proof of claim which Payne filed in his capacity as custodian for Lauren against the estate.  The adversary proceeding and the Objection were consolidated.

In the adversary proceeding, Payne seeks: (i) a judgment in the amount of $345,000 against the Debtor; (ii) an allowed claim in the amount of $345,000 based on the judgment; and (iii) a determination that the debt underlying the claim is not dischargeable pursuant to 11 U.S.C. § 523(a)(4) because the Debtor engaged in fraud or defalcation while acting in a fiduciary capacity.[2]  In his Objection, the Debtor seeks a ruling that: (i) Payne's claim is invalid and unenforceable; or, in the alternative, (ii) the debt underlying the claim is dischargeable.

The trial in this matter was held over the course of two days.  Upon consideration, the Court shall: (i) grant the Objection; and (ii) enter judgment in the adversary proceeding in favor of the Debtor and against Payne.

## BACKGROUND

### I.  PROCEDURAL HISTORY

On December 4, 2008, Debtor filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code.  On Schedule F, Debtor listed Payne as a

---

[2]  Initially, Payne was also relying upon § 523(a)(2) and (a)(6) in requesting a ruling of nondischargeability.  However, in his post-trial Memorandum of Law, Payne's argument is based solely on that portion of § 523(a)(4) which excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4).  The Court discusses this issue in detail in footnote 5 below.

creditor with a contingent, unliquidated, disputed claim in the amount of

$345,000.  *See Bankruptcy Case,*[3] *Docket Entry No. 11.*

On January 15, 2009, Payne filed an unsecured claim in the amount of

$500,000.  *Bankruptcy Case, Claims Register, Claim No. 2.*  On the same date,

Payne commenced the instant adversary proceeding by filing a complaint.

*Adversary Proceeding, Docket Entry No. 1.*  On January 16, 2009, Payne moved

for relief from the stay to proceed against the Debtor in an action which Payne

filed pre-petition in state court against the Debtor and others alleging, *inter alia*,

that the Debtor breached his fiduciary duty to Lauren.[4]  *Docket Entry No. 27.*  This

motion was denied.  *Docket Entry No. 48.*

Pursuant to an agreement between the parties, Payne filed an amended

complaint on March 19, 2009.[5]  *Adversary Proceeding, Docket Entry No. 13.*  On

---

[3]  References to "Bankruptcy Case" are to the Debtor's current Chapter 11 case which is
Bankruptcy Case No. 08-18025.

[4]  In Payne's motion for relief, he alleged the following:

> On October 24, 2008, Attorney Payne, in his capacity as
> custodian for Lauren, filed a civil action in the Court of Common
> Pleas of Berks County to No. 08-14304 (the "Berks County
> Action") against Debtor and other individual and corporate
> defendants, alleging, *inter alia*, that Debtor had breached his
> fiduciary duties to Lauren and that Debtor had wrongfully and
> fraudulently converted assets of the Corporations.  The complaint
> filed in the Berks County Action also alleged shareholder's
> derivative actions against Debtor and other defendants.

*Motion for Relief from the Automatic Stay* ¶ *9.*

[5]  In the amended complaint, Payne referred to § 523(a)(2), § 523(a)(4) and § 523(a)(6)
as authority for holding the debt at issue to be nondischargeable.  The Joint Pretrial Statement
(continued...)

3

March 30, 2009, Debtor filed his Objection, *Bankruptcy Case No. 08-18025*

*("Bankruptcy Case"), Docket Entry No. 70,* and his answer to Payne's amended

complaint, *Adversary Proceeding, Docket Entry No. 16.*

   On April 13, 2009, Debtor filed a motion to consolidate the adversary

proceeding with his objection to Payne's proof of claim.  *Adversary Proceeding,*

*Docket Entry No. 20.*  An Order granting the motion was issued on May 20, 2009.

*Adversary Proceeding, Docket Entry No. 27.*  After the discovery period ended,

the parties filed their Joint Pretrial Statement.  *Adversary Proceeding, Docket*

*Entry No. 40.*  A pretrial conference was held.  Thereafter, the trial of these

consolidated matters was held over the course of two days, namely April 9th and

April 12th of 2010.

   Four witnesses testified at the trial.  They were: (i) the Debtor; (ii) William

Lampe ("William") who is the Debtor's son and Lauren's father, *see Joint Pretrial*

*Statement ¶ 4;* (iii) Theresa Lampe ("Theresa") who is William's ex-wife and

---

[5](...continued)
also references these same three provisions. *See Joint Pretrial Statement at 13 (stating that "[t]he Plaintiff seeks a determination that his claim as a Custodian for the minor child Lauren against Harold C. Lampe, Jr., is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).").*  However, in Payne's proposed findings of fact and conclusions of law as well as his post-trial memorandum of law, he relies solely upon that portion of § 523(a)(4) that excepts from discharge debts for "fraud or defalcation while acting in a fiduciary capacity."  He never mentions § 523(a)(2) or 523(a)(6).  Moreover, none of his conclusions of law or his argument in his post-trial memorandum refer to Debtor having committed embezzlement or larceny.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law; Plaintiff's Memorandum of Law.  Accordingly, the Court concludes that Payne has abandoned and, thereby, waived these arguments.  Therefore, the sole argument before the Court relating to dischargeability is that Debtor's debt to Payne should be excepted from discharge because the debt is for "fraud or defalcation while acting in a fiduciary duty."

4

Lauren's mother, *see id.* ¶ 5; and (iv) Thomas Price who is a CPA and partner at the firm of Herbstein & Company, Inc., *Transcript, dated 4/12/10 ("Tr. 4/12") at 6-7.* Based on the demeanor, inflection and testimony of the witnesses, Theresa was the least credible witness. She testified in detail when questioned by Payne's counsel concerning whether, in 1993, the Debtor was named the custodian for Lauren of nine shares of stock in WEL Management Services,, Inc. ("WEL"); yet, from 2003 through 2006, she affirmatively and unequivocally represented that she and William were the only shareholders of WEL. Moreover, her "recollection" failed her on cross-examination when questioned specifically regarding loans made from Printing Consultants, Inc. ("Printing Consultants") to WEL. William's testimony, while often obviously self-serving, was consistent and sufficiently detailed to render it credible with regard to the fact that the Debtor made loans to Printing Complaints, Inc. ("Printing Complaints") and Printing Consultants for which it was agreed he would be repaid. The Debtor was, by far, the most credible and convincing witness. Although he had difficulty at times recalling the specific amount of the loans which he made, the documentary evidence in the record provides that information. Moreover, while some of his statements were self-serving, what came across vividly to this Court was that this is a gentleman who supported the business endeavors of his son and daughter-in-law by providing loans to start up and then keep the businesses going, who patiently waited to be repaid for the loans and who was finally forced to take

action to be repaid when it became clear that was the *only* way that it was going to happen.

At the conclusion of the trial, the Court required the parties to submit findings of fact and conclusions of law as well as post-trial memoranda which they did.  See Adversary Proceeding, Docket Entry Nos. 58-62.  The Court's Conclusions of Fact, as set forth below, are culled from: (i) the parties' Joint Pretrial Statement (ii) the witnesses' testimony; and (iii) exhibits which were admitted into evidence at the trial.

## II.  CONCLUSIONS OF FACT

A.    **Debtor's Book and the
      Formation of Paper Complaints**

1.    In approximately 1983, the Debtor, who worked for the Garrett Buchanan Company as a paper salesman, wrote a book about the use of paper in printing presses and the problems associated therewith.  Transcript, dated 4/9/10 ("Tr. 4/9"), at 18-19.

2.    In approximately 1985, William, who was also familiar with the paper industry, suggested to the Debtor that they start a business in order to sell his father's book.  Tr. 4.9 at 18-19.  Together they formed a company called Paper Complaints for the purposes of: (i) marketing the Debtor's book; and (ii) providing consulting services to companies in the printing industry.  Id.

3.    The Debtor and William were the only shareholders of Paper Complaints.  Tr. 4/9 at 20, 119.  While Debtor continued to work for the Garrett

Buchanan Company, William took responsibility for the day-to-day operations of Paper Complaints. Id. at 20-21.

4.     Several months after the book was published, Paper Complaints expanded its business to include the sale of wall charts and other peripheral items. Tr. 4/9 at 21.  Additionally, Paper Complaints set up a twenty-four hour, seven day a week service center to provide around-the-clock consulting services.  Id.

5.     Between 1985 and 1991, the Debtor made loans of his personal monies to and on behalf of Paper Complaints to assist with the formation and operation of the company and its business operations.  Joint Pretrial Statement ¶ 12.

6.     The understanding between the Debtor and William with regard to the Debtor's loans was that the company would repay the Debtor for them. Tr. 4/9 at 22-24; 164-65. The loans were made by checks from the Debtor to Paper Complaints or by his paying bills directly on behalf of Paper Complaints. Id. at 22-24, 120-29.  No promissory notes were signed nor were there any other written agreements to document the terms of the loans.  Id. at 22-24, 164-65.

7.     Theresa was aware, at least after the fact, that the Debtor made loans to Printing Complaints. Transcript, dated 4/12/10 ("Tr. 4/12"), at 27.

8.     The Debtor's recollection was that he and William agreed that the interest rate applicable to the advances and loans which he made to Printing Complaints was "about 9 or 10 percent[.]" Tr. 4/9 at 22-23.  William's recollection

7

was that they agreed to an interest rate of 10 percent interest and that the interest

would be compounded because Printing Complaints was not paying anything on

the loans.  Id. at 167-68.

## B.    The Marriage and Divorce
of William and Theresa

1.     In May of 1985 or 1986, William married Theresa.  Tr. 4/9 at 163,

Tr. 4/12 at 22.[5]  During their marriage, the couple's daughter, Lauren, was born.

Id. at 34.

2.     Theresa filed for divorce in January of 2002.[6]  Tr. 4/12 at 43.

According to the parties' Joint Pretrial Statement, William and Theresa were

divorced in 2003.  Joint Pretrial Statement. ¶ 22.  However, the couple's divorce

case has been open for nine years.  Tr. 4/12 at 56.

3.     The relationship between William and Theresa, since the

commencement of their divorce proceeding and going forward has been

contentious and hostile.[7]

---

[5]  William testified that the couple was married in 1986 while Theresa testified that they were married in 1985.  Compare Tr. 4/9 at 205 (William's testimony) with Tr. at 4/12 at 21-22 (Theresa's testimony)

[6]  Theresa testified that she told William that she was divorcing him in November of 2001 and that her attorney filed the divorce in January of 2002.  Tr. 4/12 at 43.

[7] . Theresa testified that, as of 2004, she and William had not "spoken in years." Tr. 4/12 at 50.  She also testified that, in May of 2002, William took her keys from her purse and, she assumed, used them to take all of the corporate records of WEL from the building in which they were stored.  Tr. 4/12 at 47.  She stated that she did not get the records back until 2005 when they were returned from William's attorney to her attorney.  Tr. 4/12 at 47.  William, on the other hand, testified to the contrary, stating that, although Theresa was supposed to have turned over

(continued...)

## C.    Theresa's Role in Paper Complaints and the Creation of Printing Consultants, Inc.

1.    Though Theresa and Bill were married while Printing Complaints was operating, she never had an ownership interest in the company.  Tr. 4/9 at 26; Tr. 9/12 at 23.

2.    In 1991, William told his father, the Debtor, that he and Theresa wanted to form a new company called Printing Consultants to replace Paper Complaints and asked his father whether "[he] would mind."[8]  Tr. 4/9 at 28-29. The Debtor told him that he wouldn't mind so long as he was repaid for the loans which he had made.  Id.

3.    In 1992, Paper Complaints ceased operating, and Theresa and William formed Printing Consultants.  Joint Pretrial Statement ¶ 13.

4.    Theresa and William were Printing Consultants' only shareholders. Joint Pretrial Statement ¶ 14.  The Debtor was not involved in creating Printing

---

[7](...continued)
the records of WEL in 2003, she "kept them" and "never turned them over."  Tr. 4/9 at 188.  The Debtor's testimony supports William's version of this event.  According to the Debtor, Theresa turned over xeroxed copies of the corporate records of WEL during the couple's divorce proceeding in exchange for copies of the corporate records of Printing Consultants.  See Tr. 4/9 at 130.

[8]  The reason for the transition from Paper Complaints to Printing Consultants is not clear.  Harold testified that the reason for the transition was because the company was doing more consulting work.  Tr. 4/9 at 27-28.  He also testified that, to his knowledge, with the exception of the money owed to him, Paper Complaints did not have unpaid debt to creditors at the time it was dissolved.  Id.  Theresa testified that she was told that the reason Paper Complaints was shut down was that the company had not been paying its federal income taxes. Tr. 4/12 at 27.  William also testified that the business had changed to primarily consulting; however, he admitted that part of the reason for the transition was to avoid paying creditors. Tr. 4/9/10 at 171-72.  William claimed that the creditors which were being avoided were due to the bankruptcy of his real estate investment partner, and that the partner was not involved with Paper Complaints in any way.  Id.

Consultants and he did not have any ownership interest in it. Tr. 4/9 at 28.

However, he, along with Theresa and William, were the Directors of the company

Tr. 4/9 at 170; Tr. 9/12 at 28.

5.      Printing Consultants essentially performed the same kind of business

as its predecessor, Printing Complaints; however, William testified that the new

company focused more on providing consulting services rather than on selling the

Debtor's book.  Tr. 4/9 at 26-27, 32, 171; Tr. 4/12 at 28; Joint Pretrial Statement

¶ 15.

6.      Between 1991 and 2003, the Debtor continued making advances to

and on behalf of Printing Consultants to assist with the formation of the company

and its business operations, including paying its bills.  Joint Pretrial Statement

¶ 16; Tr. 4/9 at 30-31.  Like the previous loans made to Paper Complaints, there

was no formal documentation of the loans or the terms thereof.  Id. at 31.

7.      The Debtor believed that the agreed upon interest rate for his loans

to Printing Consultants was 9 or 10 percent; though, he could not recall which

one.  Id. at 31.  In contrast, William testified that the agreed upon interest rate

was what was "reasonable" which he explained meant "[r]easonable in terms of

what we were paying on all the other loans."  Tr. 4/9 at 165-67.

8.      The Debtor loaned slightly less than $300,000 to Paper Complaints

and Printing Consultants.[9]  Tr. 4/9 at at 67-68, 121-29; <u>see</u> <u>also</u> Defendant's

Exhibit 4.[10]

9.      From time to time, the Debtor would ask about getting paid back for

his loans.  Tr. 4/9 at 29.

10.      At some point, Printing Consultants paid the Debtor back $30,000.

Tr. 4/9 at 29.   He also was provided with a car and given an American Express

Card which he was permitted to use "up to a thousand dollars any way" that he

saw fit.  <u>Id</u>. at 29, 143-44.

11.      Printing Consultants continued to do business until 2005. Joint

Pretrial Statement ¶ 15.

**D.      The Debtor's 1995 Will**

1.      In October of 1995, the Debtor was traveling to China.  Tr. 4/9 at 97.

Three days before he left, he had a will ("the Will") "hastily" prepared.  <u>Id</u>.; <u>see</u>

Plaintiff's Exhibit 33 (Will of Harold C. Lampe, Jr.).  The Debtor executed the Will.

Tr. 4/9 at 114-15.

2.      On page 2 of the Will, the Debtor stated: "I specifically make no

provision in this Will for my son, WILLIAM E. LAMPE, as I feel I have adequately

provided to him during my lifetime."  <u>See</u> Plaintiff's Exhibit 33 (Will of Harold C.

Lampe, Jr.).

_____

[9]  The Debtor testified that he obtained an equity loan of $67,000 which he used to loan
money to Paper Complaints or Paper Consulting.  <u>Id</u>. at 127.

[10]  Defendant's Exhibit 4 lists, in detail, all of the amounts advanced by the Debtor on
behalf of, or directly to, Printing Complaints and Printing Consultants.

3.      The Debtor used this language in his Will because he wanted to be "fair" to his three children and he felt that, since he had benefitted William by making loans to his businesses, namely Printing Complaints and Printing Consultants, he should distribute his remaining assets to his other two children. Tr. 4/9 at 114-15.

4.      When the Debtor returned from China, he changed the Will because it was "not what [he] wanted."  Tr. 4/9 at 97, 114-15.

**E.      Other Business Ventures of William and Theresa**
**And the Formation of WEL Management**

1.      In addition to owning and operating Printing Consultants, William and Theresa formed or acquired a number of other closely held Pennsylvania corporations between 1991 and 2003; they also owned several significant pieces of real estate.[11]  Tr. 4/9 at 172-73.  The Debtor was not involved as an owner in any of these other businesses or real estate ventures.  Tr. 4/9 at 35.

2.      In 1991, William and Theresa formed a company named WEL Management ("WEL") for the purposes of providing administrative services to the

---

[11] In addition to owning Printing Consultants, the Lampes had an interest in a commercial real estate property known as the Byrne Building, in Phoenixville, Pennsylvania. Tr. 4/9 at 33-34, 172; Tr. 4/12 at 26.  William and Theresa also owned a commercial property known as Greenway Technology Park, also in Phoenixville, Pennsylvania.  Tr. 4/9 at 36; Tr. 4/12 at 26.  Initially William had invested in these properties with a partner, Ted Edwards; however, the Lampes became the only owners of the properties in 1991, buying out Ted after he went bankrupt.  Id. at 212-214. The Lampes also acquired Ted's plastic recycling company in 1991; they named the company GTP Plastics.  Id.  The Lampes continued to invest in real estate between 1991 and the beginning of their divorce proceedings in 2002.  Tr. 4/12/10 at 29.

other businesses which they owned and to enable the couple to make new

investment purchases while working through issues they were having with bank

loans that were in default.[12]  Tr. 4/9 at 173, Tr. 4/12 at 29-30.

    3.    Theresa was primarily responsible for running WEL, while William

devoted his time and energy to Printing Consultants and a plastics company

which they owned called GTP Plastics.[13]  Id. at 59, 173.

    4.    WEL provided payroll, personnel, maintenance, janitorial,

bookkeeping, accounting, accounts receivable and accounts payable services to

Printing Consultants as well as the couples' other businesses.  Tr. 4/9 at 173;

Tr. 4/12 at 29-30.

    5.    WEL billed the businesses by issuing them invoices for its services.

Tr. 4/9 at 173-74; Tr. 4/12 at 29-33.

    6.    The Debtor believed that some of the money which he loaned to

Printing Consultants ultimately ended up being used and managed by WEL

because of the business practices being used.  Tr. 4/9 at 58.  Specifically, the

---

[12]  Theresa testified that WEL was formed because their partner in the real estate investments, Ted Edwards, had declared bankruptcy, and because Printing Consultants and their real estate entities were in "trouble due to the bankruptcy and other issues."  Tr. 4/12 at 29.  Notably, Theresa subsequently described Printing Consultants as an "income producing" entity  Tr. 4/12 at 48.  William testified that the bankruptcy of Ted Edwards caused them significant financial problems and caused current banks loans to go into technical default because of personal guarantees they had made.  Tr. 4/9 at 172, 217.

[13]  William testified Printing Consultants and GTP Plastics were the primary cash drivers and that WEL was used to consolidate money and to make intercompany transfers to ensure the cash flow within the companies was sufficient to meet their obligations.  Tr. 4/9/10 at 174.

Debtor testified that WEL "commingled" the money of the various companies as it

was handling the accounts receivable and accounts payable for each of them.  Id.

at 58, 159.[14]

─────────────────

[14]  The Debtor was questioned about the basis of his assertion that funds between
Printing Consultants and WEL were commingled:

> Q:      Sir, I'd like to direct your attention to Debtor's Exhibit
>         Number 5.
>
> A.      Yes.
>
> Q.      Again this is a fairly lengthy and voluminous
>         compilation of documentation.  Can you please
>         review these materials?
>
> A.      Yes.
>
>                      * * *
>
> Q.      Can you please describe what these materials are?
>
> A.      Okay, these are checks that were written to WEL
>         Management from out of the PCI [meaning Printing
>         Consultants] Account.  And as you can see at the
>         bottom there, it says "Apply to oldest invoice."  And
>         this is where the - all these things show where
>         funds were commingled.  Some of the checks that
>         we wrote were pretty substantial.  And WEL
>         Management and Denise Hill used the monies the
>         way they thought they wanted to.  I don't know how
>         all - - how they used them all.
>
> Q.      How did you obtain copies of these checks, sir?
>
> A.      When Bill and Terry were getting divorced, Terry
>         served papers on us to give the records of PCI to
>         her and we said we will do that, but you've got to
>         give us all the records from WEL Management.
>         Xerox copies of it.  So that's how I got these things.

Tr. 4/9 at 129-30.

7.      When the Debtor began providing services to Printing Consultants

sometime in 2000 (after he retired from the Garrett Buchanan Company), he

submitted his expense reports (for travel expenses) to, and was paid for his

expenses by, WEL. Tr. 4/9 at 55-56, 63-65. The Debtor did not ask why he was

submitting his expense reports to and getting paid by WEL when he was working

for Printing Consultants because "it was his understanding" that "they were all the

same." Id. at 65.

8.      William testified that money was moved between Printing

Consultants and WEL to "cover the bills." Tr. 4/9 at 234. When questioned on

direct examination about the transfers of funds between the companies, William

stated as follows:

> Q.      WEL Management provided payroll, personnel,
> maintenance, janitorial, bookkeeping, accounting,
> accounts receivable, and accounts payable
> services for Printing Consultants, GTP Plastics,
> the Byrne Building, the Greenway Technology
> Center?
>
> A.      Correct.
>
> Q.      Okay. And Terry was primarily responsible
> for running WEL Management, correct?
>
> A.      That is correct.
>
> Q.      Okay. You were primarily focused on
> Printing Consultants?
>
> A.      And the plastics company, yes.

15

Q.      And WEL Management charged its clients,
        like the Byrne Building and GTP Plastics
        and Printing Consultants, a fee for the
        management and administrative services
        that it provided?

A.      Correct.

Q.      And WEL Management also would make
        loans between the companies to smooth
        out cash flow ups and downs in the various
        businesses, wouldn't it?

A.      The intercompany transfers could have - - it
        would flow from one company at any point
        in time depending upon that company's
        cash position positive versus a negative
        cash position one [sic] the other companies.
        WEL could have done that.  You know, the
        primary cash driver was PCI and the
        plastics company.  The other money we
        could consolidate into WEL Management
        and then it would be intercompany
        transfers, which you can see from the tax
        returns.

Q.      Terry [meaning Theresa] kept track of all of
        those intercompany transfers in the books
        and see where the money was going,
        correct?

A.      It there was a need, there was - -

Q.      But the records were there.  If you cared to
        do it, you could come in and look and see
        where the money was going?

A.      You could.

Tr. 4/9 at 173-74.  On cross-examination, William further testified:

Q.    Were monies - - were monies normally
      moved from one entity to the other?

A.    Yes.

Q.    And why would that be?

A.    Just to - - based upon a, you, revenue cycle
      to a - - expense cycle.

Q.    So whoever needed the money, that's
      where the money was moved to get the bill
      paid?

A.    Correct.

Tr. 4/9 at 218.

9.    Defendant's Exhibit 5 consists of invoices from WEL to Printing

Consultants and checks from Printing Consultants to WEL.  See Defendant's

Exhibit 5.  When asked about this exhibit, Theresa testified that they were

"normal checks from - - that [Printing Consultants] was writing at the time and

some of the invoices."  Tr. 4/12 at 31.

10.    Three checks, dated 12/13/00, 1/4/01 and 2/15/01, in the amounts of

$500, $1,000 and $5,100, respectively, were made payable from Printing

Consultants to WEL with the notation "loan" on the bottom.  See Defendant's

Exhibit 5.  Theresa could not account for the nature of these checks.  Tr. 4/12 at

63-64.   There is no evidence in the record that Printing Consultants was repaid

for these loans.

11.    While many of the checks from Printing Consultants to WEL bear the

notation "[a]pply to the oldest Invoice" on the bottom of them, the record contains

far fewer invoices than checks so it is impossible to connect the checks to

invoices from WEL.  <u>See</u> Defendant's Exhibit 5.  Payne made no attempt to offer

additional invoices into evidence.

12.    It is obvious from Defendant's Exhibit 5 that Printing Consultants was

paying WEL large amounts but, importantly, there is no evidence, other than

Theresa's general testimony, that these amounts were being paid for services

rendered by WEL.  Rather, there is evidence that the amounts were being paid

for other purposes.  It is clear that income from Printing Consultants was

transferred to WEL and, thereafter, used to make payments on a loan from Royal

Bank.[15]  Tr. 4/12 at 31, 39, 48, 64.

---

[15]  The Debtor was asked whether WEL had loans with Royal Bank in the mid-1990's.
Tr. 4/9 at 52.  He testified that he did not know.  Theresa testified regarding a loan from Royal
Bank but she did not specifically identify the borrower on the loan.  <u>See</u> n. 16.  Plaintiff's Exhibit
35 indicates that WEL was indebted to Royal Bank on the loan and that Royal Bank had a
mortgage against property owned by GTP Plastics as security for the loan.  <u>See</u> Plaintiff's
Exhibit 35 ("Escrow Agreement") at p. 2.  During the trial, Theresa was asked "[w]hat
arrangements were made amongst the companies to make the loan payment [to Royal Bank]?"
In response, she testified as follows:

> As I said, you know, in 1998, GTP Plastics, you know, caused a
> lot of problems and what happened was that when we
> restructured and went with Royal Bank for the loan, GTP Plastics
> was in no position to pay anything on the loan.  So what we did
> was that the three entities that were in a position to pay were the
> Byrne Building, which had absolutely nothing to do with the Royal
> Bank; they weren't secured collateral or anything.  We had PCI
> that was income producing and also WEL Management was
> income producing.  So we sat down and those three entities were
> to pay into the loan so that we could pay Royal Bank its monthly
> mortgage.

Tr. 4/12 at 48.  Payne never offered any evidence to explain what, if any, benefit Printing
Consultants derived from the loan to WEL from Royal Bank.  However, Theresa's testimony

(continued...)

13.    Three checks, dated 3/16/01, 3/22/01 and 4/24/01, in the amounts of $5,200, $11,000 and $1,700, respectively, were made payable from Printing Consultants to WEL with the notations "GTP Plastics Debt Acct.," "Pla Debt," and "GTP Plastics Debt" on the bottom of them.  See Defendant's Exhibit 5.

14.    The description on an invoice, dated April 25, 2001 (the "April 25th Invoice"), from WEL to Printing Consultants states: "GTP PLASTICS DEBT CONTRIBUTION ROYAL BANK, SCH HAVEN, LEGAL."  See Defendant's Exhibit 5.  The amount of the invoice is $6,632.00.

15.    There is a check, dated 5/31/01, from Printing Consultants to WEL in the amount of $6,632.00 which is the same amount listed on the April 25th Invoice.

16.    There is a check, dated 10/22/01, from Printing Consultants to WEL in the amount of $10,128.23.  On the bottom of the check are two amounts which appear to correspond to invoice numbers.  The amounts are $3,496.23 and $6,632.00.  The latter amount is the same amount listed on the April 25th Invoice.

17.    There is a check, dated 11/217/01, from Printing Consultants to WEL in the amount of $10,053.23.  On the bottom of the check are two amounts which appear to correspond to invoices.  The amounts are for $6,632.00 and $3,421.23.  The $6,632.00 is the exact amount listed on the April 25th Invoice.

---

[15](...continued)
supports the conclusion that Printing Consultants was drained of income by WEL to make the payments on the Royal Bank loan.

18.   There is no evidence in the record that Printing Consultants was repaid for the amounts which it paid to WEL that were unrelated to services which WEL rendered to it.  Payne made no attempt to introduce such evidence into the record.

**F.    The Directors and Officers of WEL
and Theresa's Ouster from the Company**

1.   When WEL was initially formed in 1991, William, Theresa and the Debtor were named as its Directors.[16]  Joint Pretrial Statement ¶¶ 7-9.  William was also named as the Treasurer and President of the corporation, and Theresa was named as the Secretary.  Joint Pretrial Statement ¶¶ 8-9.

2.   Theresa testified that WEL held annual Directors' meetings to comply with corporate formalities.  Plaintiff's Exhibits 3, 4, 5, 7 and 8 are entitled "Annual Meeting of Shareholders and Directors WEL Management Services, Inc." and are dated January 4, 1992, January 2, 1994, January 18, 1995 and

---

[16] The Debtor testified as follows about having been made a director of WEL:

Q:    Okay.  Were you a director of WEL Management in 1994?

A..    They told me they made me a director, yes. Because of the incorporation papers, they needed three directors or something.

Q.    Okay.  But you're telling me that you - and you're telling me that you agreed to be a director.

A.    Yes, I agreed.

4/9 at 47.

20

February 17, 1996, respectively.  <u>See</u> Plaintiff's Exhibits 3, 4, 5, 7 and 8.  The

handwriting at the top of Exhibit 8 indicating the date, time and location of the

meeting as well as the signature on the bottom of the document is Theresa's

handwriting.  4/12 at 37, 62.  She regularly prepared the minutes from the annual

meetings in substantially this form.  Tr. 4/12 at 37.  The Debtor did not recall ever

attending any Director's meetings in these years.  Tr. 4/9 at 46-48.  His signature

does not appear on Plaintiff's Exhibits 3, 4, 5, 7 or 8.

3.     The Debtor signed a document entitled "Consultant's Agreement,"

dated January 1, 1995, as Chairman of the Board of Directors.  Tr. 4/9 at 48-49.

However, he had no recollection of the agreement or of being the Chairman of

the Board of Directors.  <u>Id</u>.; <u>see also</u> Plaintiff's Exhibit P-6 (Consultant's

Agreement).

4.     On or about July 5, 1996, Theresa was appointed as President and

Treasurer of the company and William took over as Secretary.  Joint Pretrial

Statement ¶ 17.   Theresa continued to act as the President of the corporation

after filing for divorce.  Tr. 4/12 at 43.

5.     Theresa held the position as President of WEL until December 8,

2003, at which time a Director's meeting was held and Theresa was voted out as

President of WEL by William and the Debtor.  Tr. 4/9 at 146; Tr. 4/12 at 46; <u>see</u>

<u>also</u> Plaintiff's Exhibit 12 (Special Meeting of the Directors Well Management

Services, Inc. on December 8, 2003.); Joint Pretrial Statement ¶ 24.  William

21

became the President of WEL.  Id.  Theresa was not removed from the Board of
Directors.  Tr. 4/9 at 82.

6.      The Director's meeting on December 8, 2003 was prearranged to
remove Theresa as President of WEL and to get her to return the company's
records.  Tr. 4/9 at 76 & 146; Tr. 4/12 at 46.  The meeting was William's idea.
Tr.  4/9 at 81, 145-47.  William told the Debtor about the meeting one or two days
ahead of time.  Tr. 4/9 at 81.  William testified that he called the December 8,
2003 Director's meeting as a "last ditch effort to try to salvage the businesses"
and get control of the records.  Id. at 186.  He claimed that Theresa had defaulted
on all of the bank loans and that he needed to try to reverse "the negative
decline."  Id.  There is no evidence in the record that the Debtor agreed to vote
Theresa out as President of WEL so that he could obtain a judgment against
WEL for the loans that had made to Printing Complaints and Printing
Consultants.

7.      The Debtor recalled attending the Director's meeting for WEL on
December 8, 2003.  To his recollection, it was the first Director's meeting that he
had ever attended for WEL.  Tr. 4/9 at 75.

8.      After the Director's meeting in December of 2003, Theresa was still
playing a limited role for WEL, attempting to sell property owned by the

22

corporation; however by that point the banks had taken over the management of the properties.[17]  Tr. 4/12/19 at 47.

9.     In January of 2005, a piece of real property, which WEL owned, known as the "East Second Street" property, was sold for approximately $1.2 million.[18]  Id. at 51.  William, Theresa and the Debtor all attended the closing on this property.  Tr. 4/9 at 44, Tr. 4/12 at 52-54.  The sale enabled "the companies to pay off all of the loans outstanding."[19]  Tr. 4/12 at 67.

## G.     Controversy over WEL's Shareholders

1.     Upon formation of WEL in 1991, or shortly thereafter, a single share of stock was issued to the Debtor.  Tr. 4/9 at 37-38; 175-76; Tr. 4/12 at 33.

2.     A Certificate, dated June 30, 1991, memorializes the issuance of one share of stock to the Debtor.  See Plaintiff's Exhibit 1.  The Certificate has two

---

[17]  Theresa had taken the lead on managing the real estate investments for the Lampes, dealing with the leasing and tenant issues as well as dealing with the lenders.  Tr. 4/12 at 28. She testified that in 1998 the companies were in financial trouble and  she negotiated the loan with Royal Bank for approximately $2.6 million which bundled together property: (i) owned by their company GTP Plastics, known as the "Schuylkill Haven" property; (ii) Greenway Technology Park, and (iii) property that WEL had acquired prior to 1998 in Boyertown, Pennsylvania.  Id. at 39-41.  As part of this renegotiation the bank also required the Lampes to attempt to sell Greenway Technology Park, which they did, applying the proceeds to pay down the loan.  Id. at 40.  The Byrne Building was also still owned at this time, however it was under a separate mortgage with Sovereign Bank.  Id. at 41.  Despite having been removed as President of WEL in 2003, Theresa testified that she remained involved in trying to sell the properties because, as a personal guarantor of the loans, the banks were coming after her.  Id. at 68.

[18]  WEL entered into the agreement to sell the "East Second Street" property in September of 2004.  See Plaintiff's Exhibit 37; Tr. 4/12 at 50-51.  The closing on the sale occurred in January of 2005.  Id. at 51-52.

[19]  Plaintiff's Memorandum of Law states that the proceeds of the sale "were sufficient to pay off all of the remaining mortgage loans for which WEL was obligated."  Plaintiff's Memorandum of Law at 9.

signatures on the bottom of it.  Id.  The Debtor testified that he believed the

signatures were that of his son and Theresa.  Tr. 4/9 at 38.  The Debtor's

signature is not on the Certificate.

3.      Neither the Debtor nor Theresa had any idea why the stock was issued

to the Debtor.  Tr. 4/9 at 38; Tr. 4/12 at 33.  The Debtor did not remember the stock

being issued to him.  Tr. 4/9 at 37, 132-33.  Rather, it was his understanding that

William and Theresa were the owners of WEL.  Tr. 4/9 at 132-33.

4.      William testified that he probably did not tell his father that he was

the shareholder of WEL.  Id. at 217.

5.      According to William, the stock was issued to the Debtor because

when WEL was formed, neither he nor Theresa "could really take ownership in

anything based upon the workouts that we were dealing with National Bank of

Mainline and so when we formed those other companies, he - you know, we put

the shares in with him."  Tr. 4/9 at 176.

6.      William testified that the Debtor paid $6,000 for his one share of

stock in WEL.  Tr. 4/9 at 178.  Plaintiff's Exhibit 2 is a document entitled "Record

of Certificates Issued and Transferred."  See Plaintiff's Exhibit 2.  It shows the

Debtor was issued one share of stock on June 30, 1991, in exchange for his

payment of $6,000.  See id.  The Debtor denied having paid $6,000 for a share of

stock in WEL. The Debtor never received a K-1 for WEL and, accordingly, never

reported any income or loss from WEL on any of his income tax returns.  Tr. 4/9

24

at 135-36.  According to the Debtor, he had "no idea" that he was a shareholder

of WEL until 2005.  Tr. 4/9 at 135.

7.     There is a second Certificate, dated January 14, 1993, certifying that

nine shares of stock in WEL were issued to "Harold C. Lampe, Jr., Custodian,

Lauren R. Lampe, under Uniform Gifts to Minors Act Pennsylvania."  Plaintiff's

Exhibit 1.  Tr. 4/9 at 39.  This Certificate also has two signatures on it which, the

Debtor testified, appear to be the same signatures (those of William and Theresa)

as the ones on the Certificate, dated June 30, 1991.  Tr. 4/9 at 39; compare

Defendant's Exhibit 1 with Defendant's Exhibit 2.  The Debtor did not sign the

Certificate.

8.     The Debtor initially testified that he had "absolutely no idea" how it

was that he "came to be the custodian for Lauren as the owner of nine shares" of

stock in WEL.  Tr. 4/9 at 39.  However, when presented with a Shareholders'

Agreement which he signed,[20] the Debtor testified that the first time that he knew

---

[20] The parties to the Shareholders' Agreement are: (i) Harold C. Lampe, Jr., (ii) Harold
C. Lampe, Jr., Custodian Lauren R. Lampe;  and (iii) WEL Management Services, Inc.  The
body of the agreement provides as follows:

> WHEREAS, the shareholders are the sole shareholders of
> this corporation, each owning share in the numbers listed below:

| Name | No. Shares |
|---|---|
| Harold C. Lampe, Jr. | 1 |
| Harold C. Lampe, Jr. Custodian Lauren R. Lampe under Uniform Gifts to Minors Act Pennsylvana | 9 |

> AND WHEREAS, the Shareholders desire to enter into an

(continued...)

that he had any interest in or connection with WEL as a shareholder in his own

right or as a custodian for shares owned by Lauren was when he signed the

Shareholders' Agreement.  Tr. 4/9 at 42-46; see also Plaintiff's Exhibit 4

(Shareholders' Agreement).  Notably, the Shareholders' Agreement is dated

January 14, 1993, but the Debtor denied signing it in 1993.  He testified that he

received and signed the Shareholder's Agreement in January of 2005 when he

attended the closing on the "East Second Street" property.  Tr. 4/9 at 42-46.

9.    When Harold was questioned on direct examination about the

Shareholders' Agreement, he admitted that: (i) his signature was on the

document; and (ii) he had no reason to believe that the document was not

---

[20](...continued)
        agreement amongst themselves and the Corporation giving the
        Board of Directors the authority to decide whether or not to furnish
        financial statements pursuant to Section 1554 of the Pennsylvania
        Business Corporation Law of 1988.

                NOW THEREFORE, in consideration thereof and the
        mutual promises contained herein, the Shareholders agree
        among themselves and with the Corporation that:

                It shall not be necessary for the corporation to furnish to
        the Shareholders who are parties to this Agreement, during any
        fiscal year, any "financial statements" for the corporation's
        business activities, including balance sheets, and/or statements of
        income and/or expenses for that, or any fiscal year.  However, any
        Shareholder shall have the right to request a financial statement
        from the corporation.  Any such financial statement so requested,
        and so prepared, shall be prepared by the corporation, or its
        accountant, on the basis of generally accepted accounting
        procedures.

Plaintiff's Exhibit 4.

prepared and signed on January 14, 1993.  Tr. 4/9 at 179.  On cross-examination, he became more vague about his recollection, testifying unconvincingly that he did not know whether the Shareholders' Agreement was signed in 1993 or 2005 but conceded that, in 2005, "it all surfaced."  Tr. 4/12 at 77-78.

10.     Theresa testified that, in her recollection, the stock was issued to Lauren "right after she was born," when she was maybe three months old because "the companies were in trouble again" and William said that they "needed to try to protect the company."[21]  Tr. 4/12 at 33-34.  However, it is clear

---

[21]  In support of Theresa's testimony that the Debtor became the custodian for Lauren of the stock in WEL in 1993, Plaintiff introduced a document titled "Unanimous Consent in Lieu of Special Meeting of Board of Directors of WEL Management Services, Inc."  Exhibit P-39.  The document which, like the Shareholders' Agreement, is dated January 14, 1993, states:

> **THE UNDERSIGNED**, being all of the Directors of the above-named corporation, do hereby adopt the following Resolution:
>
> **RESOLVED**, that full paid and non-assessable share of the corporation be issued as follows:
>
> Harold C. Lampe, Jr. Custodian Lauren R. Lampe9 [sic] shares Uniform Gifts to Minors Act Pennsylvania.
>
> **RESOLVED**, further that the President and Secretary be and they are hereby authorized and directed to issue and deliver certificates of full paid and non-assessable shares of this corporation to the said individual.
>
> **IN WITNESS WHEREOF,** the Directors of the above-named corporation have hereunto set their hands and seals.

Exhibit P-39.  Theresa testified that she recognized the signatures on the bottom of the document and that they belonged to the Debtor, William and herself.  Tr. 4/12 at 34-35.

from the record that, even if the Shareholder's Agreement was signed in 2005, Theresa had forgotten, at least until January of 2005, that they had named the Debtor as the custodian for Lauren of nine shares of WEL stock.  Tr. 4/12 at 54-55.  Morever, even through 2006, Theresa was claiming to be a 50% shareholder in WEL.

11.     In July of 2006, Theresa filed a Chapter 7 Bankruptcy case wherein she asserted that she owned 50% interest in WEL.  See Defendant's Exhibit D-19.[22]

12.     The federal tax returns for WEL for the years 2000 through 2002 indicate that William owned 100% of the stock in the company.  See Defendant's Exhibits D-11, D-12 & D-13.  See also Tr. 4/12 at 9-11.

13.     The federal tax returns for Well for the years 2003 through 2005 show that William and Theresa each owned 50% of the stock.  See Defendant's Exhibits D-14, D-15 & D-16.  See also Tr. 4/12 at 11-14.

14.     The firm of Herbstein & Company, Inc., prepared the tax returns for WEL from 2000 through 2005.   Tr. 4/12 at 7, 11, 15.  Theresa provided Herbstein & Company, Inc. with the information which it used to prepare the tax returns for WEL.  Tr. 4/12 at 12-13.

15.     In a Post Nuptial Agreement, dated June 24, 2003, between Theresa and William, they stated that they were the "sole and equal shareholders of one

_____

[22]  Theresa also filed a Chapter 11 case in 2005.  On Schedule B in this case, she indicated that she owned WEL jointly.  See Defendant's Exhibit P-18.

28

hundred percent 100%" of WEL's stock. <u>See</u> 4/9 at 182-83 (William's testimony);

4/12 at 70-71 (Theresa's testimony); Defendant's Exhibit 17 at 16-17 (the Post

Nuptial Agreement).[23]

## H.   *Harold's Lawsuit and Default*
### *Judgment against the Corporations*

1.      On May 28, 2004, the Debtor filed a three-count complaint (the

"Debtor's Complaint") in the Court of Common Pleas of Berks County,

Pennsylvania against Printing Consultants and WEL Management.  Tr. 4/9 at 83-

84.  In paragraph 2 of the Debtor's Complaint, he alleged that Printing

Consultants was the successor in interest to Paper Complaints.

2.      In Count I of the Debtor's Complaint, he alleged that: (i) beginning in

1985 and continuing through 2000, he had loaned $299,175.93 to Printing

Consultants, (ii) Printing Consultants had paid him back $8,392.07 by paying for

his car, car insurance and his American Express Account; and (iii) the interest on

the loans, at the rate of 10% per year, totaled $808,374.16.[24]  Plaintiff's Exhibit 23.

---

[23] According to the terms of the Post Nuptial Agreement, William was supposed to purchase Theresa's interest in "the businesses and also her interest in the marital residence" for approximately $487,000.  Tr. 4/9 at 183.  However, the "deal just died" because William did not have the money to pay Theresa.  <u>Id</u>. at 184-85.

[24] The Complaint alleges that Paper Complaints and then Printing Consultants agreed that the loans from the Debtor "would bear interest at the rate of ten percent (10%) per year."  Plaintiff's Exhibit 22 at ¶ 7.  No reference is made to whether the companies agreed that the interest was to be simple interest or compound interest.  However, based on the witnesses' testimony, there was no agreement that the interest would be compound interest.

3.     In Count II of the Debtor's Complaint, he alleged that: (i) he loaned

$31,000 to WEL by "borrowing from his personal line of credit;" (ii) the interest on

the loan, at the rate of 10% per year, was $65,880.93.  Id.

4.     The Debtor did not introduce evidence during the trial of a $31,000

loan to WEL or of any agreement with WEL regarding such loan.

5.     In Count III of the Debtor's Complaint, he alleged the following:

> 20.     Plaintiff believes, and therefore avers, that
> William Lampe and Theresa Lampe, as the
> sole officers and as shareholders of
> [Printing Consultants] and WEL, have used
> their positions to divert and otherwise
> commingle the accounts and funds of
> [Printing Consultants] into and with the
> accounts and funds of WEL, and used
> [Printing Consultant's] funds, that should
> have been used to repay Plaintiff's loans to
> [Printing Consultants], to pay WEL's
> business expenses and fund WEL's
> business investments.
>
> 21.     These diversions include but are not limited
> to the sum of $170,528.91 which WEL
> diverted from [Printing Consultants] to fund
> its operations in 2000 and 2001, and
> $137,450.00 which WEL diverted from PCI
> in 2000 and 2001 to fund the operations of
> Royal Recycling, Inc., a Pennsylvania
> corporation of which William E. Lampe and
> Theresa Lampe were the sole officers and
> shareholders.
>
> 22.     Plaintiff believes and further avers that
> William E. Lampe and Theresa Lampe, as
> the sole officers and shareholders of
> [Printing Consultants] and WEL, have

30

throughout the existence of [Printing Consultants] and WEL, disregarded corporate formalities and distinctions between [Printing Consultants] and WEL, and ran those companies, not as separate and distinct corporations, but as divisions of a common enterprise conducted by and through WEL.

23.    Plaintiff believes, and therefore avers, that as a result of this commingling of funds and accounts between [Printing Consultants] and WEL, [Printing Consultants] and WEL are alter egos of each other, and that WEL received the benefits of the loans which Plaintiff has made to [Printing Consultants] and is therefore liable to Plaintiff along with [Printing Consultants] to repay Plaintiff's loans to [Printing Consultants] and William E. Lampe acknowledged WEL's liability to Plaintiff for the outstanding balance of the principle and interest on the [Printing Consultant] loans of $1,107,550.09.

Plaintiff's Exhibit P-23.

6.    In September of 2002, the Debtor had also filed a similar complaint to recover the money he had loaned to Printing Complaints and Printing Consultants. Tr. 4/9 at 66-69.  In this suit, he named William, Theresa, Paper Complaints, Inc. t/a Printing Consultants, WEL as well as several other entities. Id.; Plaintiff's Exhibit 17.  Theresa retained separate counsel to represent her and WEL in the 2002 lawsuit.  Tr. 4/12 at 64-65; see also Plaintiff's Exhibits 20 & 21. However, the Debtor discontinued the suit without prejudice.  Tr. 4/9 at 72-74; see also Plaintiff's Exhibit 22 (Praecipe to Discontinue").  Initially, the Debtor

31

testified that he discontinued the suit because his son had told him that it was

interfering with his divorce proceedings but he subsequently testified that he

discontinued the lawsuit because, after the complaint was filed, his lawyer told

him that she was in "above her head" and that he should retain someone else to

represent him.  Tr. 4/9 at 72, 142-45.

7.    When the Debtor filed his 2004 lawsuit, he was aware that he was a

Director of WEL.  Tr. 4/9 at 87.

8.    Prior to bringing the 2004 lawsuit, the Debtor notified William that he

wanted to be paid back for the money he had loaned the companies.  Tr. 4/9 at 87.

9.    At the time the Debtor commenced his 2004 lawsuit, William was

acting as the President of the company, having taken over that responsibility from

Theresa at the December 8, 2003 Directors' meeting.  Tr. 4/9 at 193.  William

was aware that the lawsuit was being filed and he accepted service of the

Debtor's Complaint on behalf of both Printing Consultants and WEL on the same

date that the complaint was filed  Id. at 89, 189; Joint Pretrial Statement ¶ 31-32.

10.    Upon accepting service of the Debtor's Complaint, William did not

take any action to initiate a defense to the lawsuit on behalf of either of the

corporations.[25]    Joint Pretrial Statement ¶ 33. William testified that there was "no

---

[25]  William testified that he did not call a meeting of the Directors of WEL to discuss the
lawsuit.  Tr. 4/9/10 at 194.  He testified that Theresa was aware of the lawsuit because he left
her a message on her answering machine about it and left a a copy of the complaint in her
mailbox.  Id. at 194-98.  Theresa denied getting a message about the lawsuit or a copy of the
complaint in her mailbox.  Tr. 4/12 at 50.

32

money" to pay for a defense.  Tr. 4/9 at 191.  There was no evidence presented

to the contrary.   There is also no evidence in the record that the Debtor

requested William not to enter a defense in the lawsuit on behalf of Printing

Consultants or WEL.

11.    Because no answer was filed to the Debtor's Complaint and because

no defense was made on behalf of either Printing Consultants or WEL, default

judgments were entered in favor of the Debtor and against Printing Consultants

and WEL in the amounts of $1,107,550.09 and $1,204,439.12, respectively.[26]

Tr. 4/9 at 90; Joint Pretrial Statement ¶¶ 35-36.

12.    The Debtor never told Theresa that the lawsuit had been filed or that

a default judgment had been entered.  Tr. 4/9 at 91.

13.    Theresa testified that she not aware of the lawsuit or the default

judgment until late 2004.  Tr. 4/12 at 49.  She stated that, had she known of the

lawsuit, she would have "obtained a lawyer to fight it."  Tr. 4/12 at 50.

14.    By January of 2005, when the East Second Street property was sold,

Theresa clearly had knowledge of the lawsuit because the Debtor had to execute

the Release of Judgment document so that good title could be delivered to the

buyers.  4/12 at 51.

---

[26]  The Debtor was asked to attend the closing in January of 2005 on the "East Second
Street" to execute a Release of Judgment which he did.  4/9 at 93-94.  See also Plaintiff's
Exhibit 34 (Release of Judgment).  The Release of Judgment was needed because of the
default judgment which the Debtor had obtained against WEL on June 30, 2004.  Tr. 4/9 at 95,
148.

15.     On March 29, 2005, execution proceedings were commenced on the

Debtor's behalf against one of WEL's properties known as the Reading Avenue

Property which was located in Boyertown.  Id. at 110; Joint Pretrial Statement

¶ 37.  WEL still owned other properties at this time.  Tr. 4/9 at 110, 150.[27]

16.     The Debtor knew he was the custodian for Lauren of nine shares of

stock in WEL before execution proceedings were commenced on his behalf

against the Reading Avenue Property in March of 2005.  Tr. 4/9 at 108.

17.     On July 8, 2005, the Reading Avenue Property was sold at a sheriff's

sale; the Debtor bought the property.  Tr. 4/9 at 110-112; Joint Pretrial Statement

¶ 37.  The Debtor subsequently sold the property for approximately $345,000, of

which about $320,000 was paid to him as partial satisfaction of the default

judgment.  Tr. 4/9 at 111-21; Joint Pretrial Statement ¶ 40.

18.     While the $320,000 only partially satisfied the Debtor's $1.2 million

default judgment against WEL, the Debtor testified: "[A]s far as I was concerned, I

was paid clear.  I got my money back and that's all I cared about."  Tr. 4/9 at 112.

See also Tr. 4/9 at 149-50 (testimony by the Debtor that his sole focus was

getting back his money).

---

[27] When asked about the other properties that WEL owned at the time, the Debtor
testified:

> Well they owned - - there were six parcels of ground at the
> Boyertown plant.  The main plant, the part that I got, and there
> was a part called the lumber yard and then another one that was
> called the coal yard.  And these were chunks.

Tr. 4/9 at 150.

## DISCUSSION

In order to resolve this consolidated proceeding, the Court must determine whether Payne has a claim on Lauren's behalf against the estate and if so, in what amount.  If these issues are resolved in Payne's favor, then the Court must determine whether the debt underlying Payne's claim is nondischargeable pursuant to § 523(a)(4) as a debt "for fraud or defalcation while acting in a fiduciary duty.

### I.  Burden of Proof in Claim Litigation

The Proof of Claim which Payne filed in the Debtor's bankruptcy case asserts that the basis of his claim is "[f]raud and breach of fiduciary duties" and that the debt was incurred on 5/28/04 when the Debtor obtained his judgments against Printing Consultants and WEL.  Payne attached no documentation whatsoever to his claim.

The law on the burden of proof in claim litigation is generally well established.  In re Kincaid, 388 B.R. 610, 613 (Bankr. E.D. Pa. 2008).  A proof of claim executed and filed in accordance with the rules of procedure constitutes "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  When an objection is filed to a proof of claim that is entitled to the prima facie effect of Rule 3001(f), then the objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's claim.  In re Massaquoi, 412 B.R.

35

702, 707 (Bankr. E.D. Pa. 2008). "[T]he objector must produce evidence which, if

believed, would refute at least one of the allegations that is essential to the

claim's legal sufficiency." In re Allegheny International, Inc., 954 F.2d 167,

173-74 (3d Cir.1992). If the objector succeeds in overcoming the prima facie

effect of the proof of claim, then "the burden reverts to the claimant to prove the

validity of the claim by a preponderance of the evidence." Id. at 174. However,

"where the proof of claim does not adhere to the requirements of Rule 3001 by

providing the facts and documents necessary to support the claim, it is not

entitled to the presumption of prima facie validity." In re Kincaid, 388 B.R. at 614.

In such a situation, the burden of going forward and proving its claim by a

presumption of the evidence is on the claimant. Id.

In his Objection, the Debtor specifically argued that Payne's claim is not entitled

to the prima facie effect of Rule 3001(c) because Payne failed to file any

documentation in support of his claim. Indeed, Payne did not even file

documentation to establish his connection to the Debtor. He, likewise, filed no

documentation to establish the "basis of his claim" which he listed as "fraud or

breach of fiduciary duties." Consequently, this Court holds that Payne's Proof of

Claim is not entitled to prima facie validity and that Payne bears the burden of

going forward and proving his claim by a presumption of the evidence.[28]

---

[28] In so ruling, this Court is aware that the majority of courts have held that compliance
with Rule 3001(f) is "not the sole vehicle for a proof of claim to achieve prima facie status." In
re O'Brien, 436 B.R. 773, 784 (Bankr. E.D. Pa. 2010). As the Court explained in In re O'Brien:

> In determining whether a non-conforming proof of claim has
> shifted the burden of production to the objecting party, courts

(continued...)

## II. Substance of Claim

In order to find that Payne has a claim against the estate in the amount of

$345,000,[29] the Court must find, by a preponderance of the evidence, that: (i) the

Debtor was the custodian of nine (9) shares of stock in WEL for his

granddaughter, Lauren; and (ii) that the Debtor breached his fiduciary duty to

Lauren in his role as a director of WEL or as the custodian for her of her WEL

stock.

## A.   Whether the Debtor was the Custodian for Lauren of Nine Shares of Stock in WEL

The Debtor contends that Lauren does not own nine shares of stock in

WEL and that he was never the custodian for her of any stock in WEL because:

(i) the Pennsylvania Uniform Gift to Minors Act did not exist on the day when the

shares were issued to her; (ii) he did not consent to being a custodian for her with

---

[28](...continued)
  following the majority approach usually consider other information
  available in the bankruptcy record.  The most common source
  consulted is the debtor's schedules, which may contain
  admissions that shore up shortfalls in the proof of claim.

Id. (citations omitted).  While the Debtor listed Payne's claim on his Schedule F, he listed it as
disputed, thereby specifically denying the claim's validity.

In any event, even if Payne's claim was given prima facie effect, the Court would still
rule in the same manner on the Objection.  The Debtor provided evidence which refutes
Payne's contention that he breached his fiduciary duties.  Moreover, there is no evidence
whatsoever that the Debtor committed fraud.

[29]  In his amended complaint, Payne seeks a judgment against the Debtor and an
allowed claim in the Debtor's bankruptcy case in the amount of $345,000.00 which is the
amount the Debtor received when he sold the Reading Avenue Property.

regard to the stock; and (iii) at all relevant times William and Theresa publicly

held themselves out as either sole or co-equal shareholders of the stock in WEL.

None of these arguments are persuasive.

The Debtor is correct that, before the issuance of stock to him as the

custodian for Lauren, the Pennsylvania Uniform Gift to Minors Act ("PUGMA")

was repealed in 1992 and replaced by the Pennsylvania Uniform Transfers to

Minors Act ("PUTMA"), 20 Pa.C.S.A. §§ 5301 et seq. Sternlicht v. Sternlicht, 583

Pa. 149, 152 n.1, 876 A.2d 904, 906 n.1 (Pa. 2005).[30]  However, this change in

the law did not affect the validity of the stock transfer because the PUTMA

applies to transfers made after the effective date thereof if the "transfer purports

to have been made under the Pennsylvania Uniform Gift to Minors Act[.]"  See 20

Pa.C.S.A. § 5301 (Historical and Statutory Notes (quoting from Section 26 of

1992, Dec. 16, P.L. 1163, No. 152)).  The relevant Certificate in the instant case

"certifies that Harold C. Lampe, Jr., Custodian, Lauren R. Lampe under the

Uniform Gifts to Minors Act Pennsylvania is the owner of Nine (9) shares" of stock

in WEL.  Plaintiff's Exhibit 1.  This language was sufficient for the purposes of

transferring stock to Lauren under the PUGMA, see C.M. Regan v. Connelly,

2000 WL 1661524, at *5 (Tenn. Ct. App. November 6, 2000) (ruling that stock

---

[30]  In Sternlicht, the Pennsylvania Supreme Court observed that "PUTMA is a uniform
law modeled on the Uniform Transfers to Minors Act (UTMA), which was approved by the
National Conference of Commissioners on Uniform State Laws in 1983."  583 Pa. at 152  n.1,
876 A.2d at 905 n.1.

certificates issued to "'Dan Connelly Trustee for Traci Connely [UGMA]' and to

'Dan Connelly Trustee for Casey Connelly [UGMA][,]'" effectively transferred

stock to "Connelly, as custodian for his children, under the UGMA.").[31]   Therefore,

it was also sufficient for purposes of transferring the stock to Lauren under the

PUTMA.

Secondly, the Debtor, by his own admission, knew by January of 2005 that

he was the custodian for Lauren of nine shares of stock in WEL.  At that time, by

his own testimony, he signed the Shareholders' Agreement which specifically

states that he owned one share of stock in his name and nine shares of stock as

the custodian for Lauren under the PUGMA.  Had he disagreed with the

information set forth in the Shareholders' Agreement, it was his responsibility to

refuse to sign it.  See Jones v. The Money Store, Inc. (In re Jones), 284 B.R. 92,

96 n.5 (Bankr. E.D. Pa. 2002) ("It is the responsibility of the executing party to

understand the significance of the documents he or she is signing."), aff'd, 308

B.R. 223 (E.D. Pa. 2003).  By executing the agreement, he indicated his consent

to the information and statements made therein.

Lastly, the fact that William and Theresa publicly held themselves out as

either the sole owner of WEL stock (William) or co-equal owners of the WEL

stock (William and Theresa) is not relevant to who actually owned the stock.

---

[31] In In re Gumpher, 840 A.2d 318, 322 (Pa. Super. 2003), the Pennsylvania Superior
Court approved of the use of case law decided by its "sister states" under their Uniform Gift to
Minors Acts.

39

When a transfer is made under the PUTMA, it is irrevocable and the property that is transferred becomes the property of the minor. <u>See</u> Sternlicht, 583 Pa. at 158-60, 876 A.2d at 909-10.

Therefore, the Court concludes that Payne has proven, by a preponderance of the evidence that Lauren owns nine (9) shares of stock in WEL and that the Debtor has been her custodian for such shares since at least January of 2005. This conclusion requires the Court to determine whether the Debtor breached his fiduciary duties as a Director of WEL or the custodian for Lauren of her stock in the company.

**B.    Whether the Debtor breached his fiduciary
duty as a director of WEL or as the custodian
of Lauren for her shares of stock in WEL**

**(i)    As a Director of WEL**

As a director of WEL, the Debtor stood "in a fiduciary relation to the corporation" and was obligated to perform his duties as a director "in good faith" and in a manner which he reasonably believed "to be in the best interests of the corporation and with such care, including reasonably inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa.C.S.A. § 512(a); 15 Pa.C.S.A. § 1712(a).[32] The fiduciary obligation of a

---

[32] Notably, the duty of a director is generally owed solely to the corporation and may be enforced directly by the corporation. 15 Pa.C.S.A. § 517; 15 Pa.C.S.A. § 1717. However the duty may also be enforced indirectly by a shareholder in a shareholder derivative action. <u>Id</u>. Payne contends that this adversary proceeding constitutes a "shareholder's derivative action" against the Debtor for breaching his fiduciary duties as a Director of WEL. Plaintiff's

(continued...)

director includes "both a duty of care and a duty of loyalty." Anchel v. Shea, 762 A.2d 346 (Pa. Super. 2000); see also Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147(1947). However, the duty that a fiduciary owes to a corporation "does not absolutely preclude a director from dealing with the corporation." Bernstein v. Donaldson (In re Insulfoams, Inc.), 184 B.R. 694, 707 (Bankr. W.D. Pa. 1995).

Under Pennsylvania law, "the test for liability for breach of fiduciary duty is whether a director was unjustly enriched by his or her actions." Mindbridge.com, Inc. v. Testa, 2008 WL 4966053, at *5 (E.D. Pa. Nov. 21, 2008) (citing Seaboard Industrustries v. Monaco, 442 Pa. 256, 276 A.2d 305, 309 (1971)); Miller v. Dutil (In re Total Containment, Inc.), 2005 WL 6522761, at *8 (Bankr. E.D. Pa. Oct. 18, 2005) (quoting Official Committee of Unsecured Creditors v. Forman (In re Forman Enterprises), 281 B.R. 600, 610 (Bankr. W.D. Pa. 2002)); InfoSAGE, Inc. v. Mellon Ventures, L.P., 896 A.2d 616, 637 (Pa. Super. 2006). Based on the record, Court concludes that the Debtor was not "unjustly enriched" by his actions.

The witnesses' testimony and the trial exhibits leave no doubt that the Debtor provided loans to Printing Complaints and Printing Consultants for which it

---

[32](...continued)
Memorandum of Law at 10. Since the Debtor does not argue to the contrary, see Brief in Support of the Defendant's Post-Trial Proposed Findings of Fact and Conclusion of Law at 17-18, the Court shall treat it as such.

was agreed the companies would repay him.  Payne's suggestion that the

advances which the Debtor made to Printing Complaints and Printing Consultants

were gifts is directly contradicted by the evidence in the record, even by

Theresa's testimony.  Moreover, even subtracting the $38,392.07 (which is the

total of the $30,000 which the Debtor testified that he was repaid plus the

$8,392.07 which paragraph 8 of his state court complaint alleges he was repaid)

from the earliest loans which the Debtor made and giving him only nine percent

simple interest[33] on the balance of the amounts listed in Defendant's Exhibit 4

from 1987 through 1990 *only*,[34] the Debtor was owed more than $485,000 just for

---

[33] Based on the record, it is clear that some interest rate applied to the loans which the Debtor made to both Printing Complaints and Printing Consultants.  Based on the conflicting testimony concerning the interest rate applicable to the Debtor's loans to Printing Complaints, the Court concludes that the applicable interest rate was nine percent (9%) simple interest. William's testimony that they agreed that the interest on the loans to Printing Complaints would be compound interest rather than simple interest was simply not credible.  As for the interest rate applicable to the Debtor's loans to Printing Consultants, the Court finds it unnecessary to reach that issue.

[34] The total principle amount of Debtor's loans, as listed on Defendant's Exhibit 4, for 1985 through 1990 is $247,779.89 ($3,015.76 from 1985; $33,694.95 from 1986; $38,399.49 from 1987; $115,000.00 from 1988; $9,692.00 from 1989; and $47,779.89 for 1990 for a total of $247,779.89).  However, this amount does not exclude the $30,000 which the Debtor admitted that he was repaid or the $8,392.07 which he alleged that he was repaid in paragraph 8 of his state court complaint.  Deducting $38,392.13 ($30,000 + $8,392.07 = $38,392.13) from the earliest loans made, the outstanding principle amount which the Debtor was owed for the loans he made from 1985 through 1990 was $209,387.13 ($247,779.89 - $38,392.07 = $209,387.13). Attributing an interest rate of just nine percent (9%) simple interest to these loans (beginning in 1987 since the loans in 1985 and 1986 were repaid entirely by the $38,392.07 mentioned before), the total amount owed for principle ($209,387.82) and interest ($276,469.93) for the loans made from 1985 through 1990 is $485,857.75 (as shown by the chart below).

| Year | Amount Loaned | 9% Simple Interest Owed to 2004 |
|------|---------------|----------------------------------|
| 1987 | $36,718.13 | $52,874.11(interest for 16 years) |
| 1988 | $115,000.00 | $155,250.00 (interest for 15 years) |
| 1989 | $9,692.00 | $12, 211.92 (interest for 14 years) |

(continued...)

the loans which he made before 1991.  Furthermore, the Court is persuaded that

funds between Printing Consultants and WEL were indeed intermingled and that

there was a good faith basis for the allegations in Count III of the Debtor's

Complaint that WEL should be held liable for his loans to Printing Complaints and

Printing Consultants.  Since the Debtor only received $345,000 for the Reading

Avenue Property and did not execute against any other property of WEL, the

Court concludes that he was not unjustly enriched.

Notably, Payne has not cited any case law which holds that a director of a

corporation breaches his or her fiduciary duty simply by bringing a suit against the

corporation.  Instead, Payne cites Burnham v. Bartley (In re Specialty Tape

Corporation), 132 B.R. 297 (Bankr. W.D. Pa. 1991), as support for his position.

In Burnham, the court found that two of the directors of the debtor corporation

engaged in a "clandestine sale," to transfer the debtor's assets to another

company which one of them owned.  Id. at 301-02.  In ruling in favor of the

plaintiffs, the Court concluded that held that the directors had not acted in good

---

[34](...continued)

| | | |
|---|---|---|
| 1990 | $47,977.69 | $56,133.90 (interest for 13 years) |
| **TOTALS:** | **$209,387.82** | **$276,469.93** |

The additional principle amount of the loans which the Debtor made from 1991 through 2000 was $51,123.53 ($12,784.48 from 1991; $9,710.86 from 1992; $8,170.86 from 1993; $5,943.45 from 1997; $973.92 from 1998; $4,410.84 from 1999; and $9,129.19 from 2000 for a total of $51,123.53), excluding interest.  See Defendant's Trial Exhibit 4.  Therefore, there is no doubt that the Debtor was owed substantially in excess of the $345,000 for which Payne is seeking an allowed claim and a judgment against the Debtor.

faith and had been unjustly enriched.  Id.  In the instant case, the evidence is to

the contrary.  While the Debtor clearly acted in his interest in seeking to be repaid

for the loans which he made to Printing Complaints and Printing Consultants, he

was entitled to be repaid for the loans.  Moreover, given the intermingling of funds

between Printing Consultants and WEL and the evidence that money was

siphoned from Printing Consultants to WEL for its benefit or so that WEL could

transfer the funds to some other related company, the Debtor acted within his

right in seeking repayment of his loans from WEL.

While not involving a lawsuit by a director of a corporation against it, the

Court finds the decision of Mindbridge.Com, Inc. v. Testa, 2008 WL 4966053

(E.D. Pa. Nov. 21, 2008), instructive in this matter.  In Testa, the plaintiff

corporation alleged that the defendant, who was one of its officers and directors,

breached his fiduciary duty to the corporation by falsely representing that he was

owed at least $300,000 by the plaintiff and in procuring a $300,000 promissory

note for the debt.  The court disagreed.  In ruling in favor of the defendant, the

court reasoned that, while the plaintiff's "transactions were not well documented,

if at all," the testimony that the defendant had made advances to the plaintiff and

that he was to be repaid for them was credible.  Id. at *5.  The instant situation is

similar.  Simply because the Debtor was a Director of WEL does not mean that

he was not entitled to seek a judgment against the company for loans for which

44

he reasonably believed WEL was obligated to repay him.  William, as the

President of WEL, could have entered a defense on behalf of WEL to the

Debtor's Complaint.  He did not do so.  The record contains no evidence that the

Debtor requested or convinced William not to do so.  While it may have been

more forthcoming for the Debtor to notify Theresa when he filed his 2004 lawsuit,

the Debtor was not unjustly enriched by his actions. Therefore, the Court rejects

Payne's contention that he has a valid claim against the Debtor for breaching his

fiduciary duty as a director of WEL.

### (ii)    As the Custodian of Lauren for her
### Nine Shares of Stock in WEL

As the custodian for Lauren of her nine shares of stock in WEL, the Debtor

was held to the following standard of care under the PUTMA:

> In dealing with custodial property, a custodian shall
> observe the standard of care that would be observed by
> a prudent person dealing with property of another and is
> not limited by any other statute restricting investments
> by fiduciaries.  If a custodian has a special skill or
> expertise or is named custodian on the basis of
> representations of a special skill or expertise, the
> custodian shall use that skill or expertise.

20 Pa.C.S.A. § 5312.  Moreover, Pennsylvania case law holds that a custodian

may not use the property which he is holding to benefit himself.  Sternlicht, 822

A.2d at 740 (citing Sutliff v. Sutliff, 515 Pa. 393, 404, 528 A.2d 1318, 1323

(1987)).  The record does not support a finding that the Debtor breached his

custodial duties to Lauren.

As the Court observed above, the Debtor was owed substantially more than $345,000 for loans which he made to Printing Complaints beginning in 1985 and continuing just through 1990.  Furthermore, based on the intermingling of funds between Printing Consultants and WEL, the Debtor had reasonable grounds for asserting his claim in state court to have WEL held liable for these loans.  In seeking a judgment against WEL for his loans and in executing on that judgment against real property which WEL owned, the Debtor exercised his right to obtain what he was validly owed.  In doing so, he did not deprive Lauren of her nine shares of stock in WEL nor of any assets to which WEL was legally entitled. Consequently, this Court concludes that the Debtor did not breach his duties as the custodian for Lauren of her stock in WEL.  Her parents were well aware at the time of the gift to Lauren that the Debtor was owed money from WEL, a conflict they waived on Lauren's behalf.  To hold otherwise would mean that, while a director or officer, a PUTMA custodian, would violate his custodial duty any time he authorized the company to incur or pay debt, especially to or from himself.

Having determined that the Debtor did not breach his duties as a director of WEL or as the custodian of Lauren of her stock in WEL, the Court shall grant the Debtor's Objection, rendering it unnecessary for the Court to address the issue of nondischargeability under § 523(a)(4).

46

**SUMMARY**

For the reasons set forth above, the Debtor's Objection is granted.

Payne's Proof of Claim is unenforceable and is disallowed.  Judgment in this

adversary proceeding shall be entered in favor of the Debtor and against the

Plaintiff.


Dated:  November 19, 2010.        _____
                                   HONORABLE JEAN K. FITZSIMON
                                   United States Bankruptcy Judge